IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PETER AUKSTUOLIS,      )
     )
     Plaintiff,      )
     )     No. 11 C 2245
vs.      )
     )     Magistrate Judge Schenkier
MICHAEL J. ASTRUE,      )
     )
     Defendant.      )

## MEMORANDUM OPINION AND ORDER

Peter Aukstuolis has filed a motion seeking reversal and/or remand of a determination by the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying his claim for Disability Insurance Benefits ("DIB"). The Commissioner, in turn, has filed a motion seeking summary affirmance of that same determination. For the reasons set forth below, the Court grants the Commissioner's motion (doc. # 21), and denies Mr. Aukstuolis's motion (doc. # 19).

### I.

We begin with the procedural history of this case. Mr. Aukstuolis filed for Disability Insurance Benefits on May 2, 2007, alleging a disability onset date of August 24, 2006 at the age of 47 years old (R. 9). His claim was denied on June 1, 2007 and again upon reconsideration on October 31, 2007 (*Id.*). Upon Mr. Aukstuolis's request, the Administrative Law Judge ("ALJ"), Mary Ann Poulose, heard his case on July 1, 2009 (*Id.*). In a written opinion, the ALJ denied benefits on July 17, 2009 (*Id.*). Claimant requested judicial review of the decision for which this Court has jurisdiction pursuant to 42 U.S.C. § 405(g). Pursuant to the consent of the parties and 28

U.S.C. § 636(c), on May 26, 2011, the case was reassigned to this Court for all further proceedings, including the entry of final judgment (doc. ## 9-10).

## II.

We now summarize the administrative record. We set forth the general background in Part A, followed by the medical record in Part B. In Part C, we discuss the hearing testimony. We address the ALJ's written opinion in Part D.

## A.

Mr. Aukstuolis was born on February 14, 1959 (R. 125). He is a high school graduate and currently lives with his wife and two dogs (R. 28).

Mr. Aukstuolis's most recent past work experience includes 13 years at a casino as a slot technician, host, and a cashier, and, prior to that, two years at a golf course as a maintenance man (R. 156). His last job as a slot technician at Harrah's Casino involved working on and moving slot machines, paying out jackpots, and taking care of guests (R. 29-30, 156). After being on disability for a period of time, he attempted to go back to work in August or September of 2007 to keep his job and insurance, but after one day he was sent home (R. 30).

## B.

In January 2004, after complaints of numbness in his left leg, persistent pain, weakness, and progressive foot drop, Mr. Aukstuolis underwent arthroscopic surgery on his left knee (R. 232). The surgery was performed by Dr. Komanduri, and included lateral release and fasciotomy (*Id.*). In July 2006, an MRI of Mr. Aukstuolis's left knee revealed findings consistent with a complete tear in the lateral meniscus, multiple large superficial venous varicosities in multiple aspect of the knee, and patellofemoral joint effusion with a Baker's cyst (R. 304). Dr. Komanduri performed a second

2

arthroscopy with a plica excision on Mr. Aukstuolis's left knee in August 2006 (R 246). Also in July 2006, Mr. Aukstuolis was diagnosed bilaterally with superficial thrombophlebitis and treated for it at that time (R. 327).[1] In subsequent visits, Mr. Aukstuolis's doctors described his gait as normal (R. 337, 362).

In addition to his knee problems, Mr. Aukstuolis experienced problems with his right shoulder. Mr. Aukstuolis complained of chronic cervical spine pain and pain in his right shoulder for 13 years (R. 126, 337). In July 2006, an MRI of his right shoulder revealed rotator cuff tendinopathy without evidence of a tendon tear, adhesive capsulitis, moderate hypertrophic degenerative change of the AC joint (R. 265). Dr. Komanduri performed arthroscopic surgery on Mr. Aukstuolis's right shoulder in September 2006 (R. 262). This surgery did not alleviate Mr. Aukstuolis's symptoms, and he experienced additional pain in his right bicep (R. 281). In November 2006, Mr. Aukstuolis underwent a second arthroscopic surgery to his right shoulder, again performed by Dr. Komanduri (R. 285, 293).

Following the second surgery Mr. Aukstuolis began physical therapy and saw some improvements in strength and flexibility (R. 365). However, he still complained of tightness, pain, tingling, and occasional numbness (*Id.*). In May 2007, even though an examination of Mr. Aukstuolis revealed no obvious weakness or atrophy of his arm muscle and an unremarkable sensory examination, he claimed the second arthroscopy did not alleviate all of his pain (R. 337). Dr. Komanduri reported Mr. Aukstuolis had persistent pain in his neck area down his right shoulder that was out of proportion to his shoulder complaints (R. 471, 527). Mr. Aukstuolis also complained

---

[1]"Superficial thrombophlebitis is inflammation of a vein due to a blood clot in a vein located just below the skin's surface." *University of Maryland Medical Center, Medical Dictionary*, http://www.umm.edu/ency/article/000199.htm (Accessed June 26, 2012).

of headaches and constant pain in his right side (R. 471). An EMG and nerve conduction study performed by Dr. Saadi revealed no evidence of carpal tunnel syndrome, or of ulnar neuropathy on either side, or of a cervical radiculopathy, or brachial plexopathy in his right upper extremity (R. 353). An MRI of his cervical spine revealed a small disc herniation at the C5-6 level, predominantly on the right side (R. 337).

On April 26, 2007, at the neurosurgery clinic, Dr. Saadi noted that Mr. Aukstuolis's range of motion of his cervical spine was diminished, especially on lateral rotation to the right side (R. 337). However, Dr. Saadi also commented that the disc herniation finding was not consistent with Mr. Aukstuolis's symptomatology, particularly his sensory problems in his right side (R. 338). Dr. Saadi conducted further tests, but the MRI of his brachial plexus was normal (R. 339). A CT scan of his brain on June 21, 2007 showed no significant abnormalities and no evidence of a cavernous hemangima (R. 342). Mr. Aukstuolis received two unsuccessful cervical spine epidurals in an attempt to avoid further surgeries (R. 400-401). In July 2007, Mr. Aukstuolis had an anterior cervical discectomy and fusion ("ACDF") (R. 339) to help with his shoulder and cervical pain, as well as his headaches (R. 341). After the surgery, Mr. Aukstuolis's radicular pain diminished in his upper extremity (R. 341). However he still complained of numbness and tingling (R. 341). Due to his continuing pain, Dr. Saadi referred Mr. Aukstuolis to Dr. Urbanowski, who suggested medication rather than further surgical treatment to alleviate Mr. Aukstuolis's pain (R. 579). Due to the loss of insurance, Mr. Aukstuolis did not follow up on that treatment (R. 14).

## C.

Mr. Aukstuolis's testimony added additional information not documented in his medical files. Mr. Aukstuolis claimed to have difficulty walking up the 12 steps in his basement (R. 32). He also testified that he needs to sit down after about half an hour of standing or half a block to a block walking because his left knee feels like it's going to give out (R. 34). Mr. Aukstuolis testified that he goes grocery shopping with his wife and walks to a pond that is about a football field's length, or 300 feet, away (R. 34, 36). He claimed he has difficulty getting up from a squatting position (R. 36). Mr. Aukstuolis stated he has never used a cane nor has anyone ever prescribed a cane for him (R. 37). He said he never has any problems with falling (*Id.*). He claimed he did not receive much physical therapy for his knee because he was concentrating on his shoulder and headache problems (*Id.*). He also claimed the doctor told him he would eventually need a knee replacement when he was old enough (R. 34); however, no such prognosis is reflected in the medical record.

Mr. Aukstuolis testified that because of the problems with his right shoulder and arm, he has to do everything with his left hand (R. 31-33), although he said that cold weather bothered his left arm (R. 37). He claimed numbness, tingling, and spasms in his right hand (R. 33). Mr. Aukstuolis said he uses a thick pen to write but that his writing is poor and his arm shakes (R. 34). He testified that he does not "trust" his right hand for shaving, going to the bathroom, putting his pants on, or sponging himself (R. 31).

Mr. Aukstuolis said he cannot hold a cup of coffee in his right hand without spilling it; nor can he turn a doorknob with his right hand, because it causes pain in his upper shoulder and causes his bicep to cramp up (R. 33). Mr. Aukstuolis no longer plays the accordion because of his right arm pain and weakness (R. 47). He claimed he cannot lift a gallon of milk or a 24-can case of soda with

his right hand, but he can lift them with his left hand (R. 32-33). He testified that he cannot push himself up with his right hand (R. 36). In physical therapy, Mr. Aukstuolis said that the heaviest weight he used was two pounds (R. 38); four-pound weights were too heavy and fell out of his hand (R. 45). He also did ladder finger exercises in physical therapy, which he said made his hand tremble (R. 38). Additionally, some of the exercises gave him headaches (*Id.*). Because he lacks health insurance, Mr. Aukstuolis is not currently seeking further treatment (R. 38, 52).

Mr. Aukstuolis said the pain in his arm gets worse with increased use (R. 44). He occasionally uses a lubricant to alleviate pain (R. 43). Starting in 1993 or 1994, after an elbow injury, his hand turns cold and bluish (R. 44). He testified his doctors were aware of the elbow problem even though it is not documented in his medical records (*Id.*). Mr. Aukstuolis worked for about 13 years despite his elbow and hand problems (*Id.*).

Mr. Aukstuolis testified that he cannot turn his head past a certain degree (R. 39). He can see all the mirrors in his car when driving (*Id.*). Tilting his head backwards to look up is difficult (*Id.*).

Mr. Aukstuolis also testified that he suffers from severe headaches and migraines that start in his right eye and travel back to his spine until he feels "like a little lump" and falls down between his shoulder, down to the front of his right arm and fingers (R. 39). Recently the pain has traveled down his right leg as well (R. 40). According to his testimony, the pain is so bad he sometimes vomits (*Id.*). He testified that his headaches occur daily and he takes migraine Excedrin once or twice a day (*Id.*). He said he does not like to take stronger medication like Vicodin because it makes him hallucinate (R. 42). He testified lies down for about four hours every other day (R. 40). Mr.

6

Aukstuolis had these same headaches during the years he worked, but he continued working anyway (R. 46-47).

In addition, Mr. Aukstuolis also testified to other physical impairments. He also complained of feeling nauseated and of restless sleep (R. 32). He testified that his back bothers him when sitting (R. 34). He claimed he cannot watch an entire television show unless he is in a recliner (R. 35). He claimed to be uncomfortable in the chair during his testimony (*Id.*). Leaning forward relaxes his back and is more comfortable (R. 46).

Mr. Aukstuolis testified about his daily activities. In addition to grocery shopping he also grills his food. He said he only uses his left hand when grilling or fishing (R. 36, 45). When fishing, he uses his left hand because he cannot feel a fish tugging on the line if he is holding the fishing pole in his right hand (R. 36). He does not filet his own fish (*Id.*). He goes for golf cart rides, but he said recently he has experienced back pain when the cart goes over bumps (*Id.*). Mr. Aukstuolis can also drive a car. For example, he drove himself 40 minutes to the hearing with the ALJ (R. 31).

When asked by the ALJ if he could do the work required by his old job, Mr. Aukstuolis answered he could not because he cannot write, reach with his arm, or carry things like he used to do (R. 47). He did not mention his knee or his headaches as reasons he could not return to his previous employment (*Id.*).

A vocational expert ("VE") also testified at the hearing. The ALJ asked the VE if there were jobs that a 47-year-old person with the claimant's experience and education could perform if he "were limited to light work, which only required occasional pushing and pulling on the right, down the right hand, and only occasional rotation and extension of the neck. No climbing of ladders, ropes or scaffolds, only occasional stairs, only occasional crouching, crawling and kneeling. And no full

extension of the right arm for reaching" (R. 54). The VE said that such a person would not be able to return to the past work performed by Mr. Aukstuolis (*Id.*). However, the VE testified that such a person could work as an information clerk, sales attendant or general parking lot attendant (not driving cars), for which there are approximately 4,000, 29,500 and 2,000 jobs respectively in the regional Chicago area (R. 55).

The ALJ also asked the VE whether the person would be eliminated from any of these jobs if he was also limited to sit and stand every half hour (if that limitation would take him off task more than 10 percent of the day), as well as the occasional use of handling or fingering in the right, dominant hand (R. 55-56). The VE responded that, for an individual with those restrictions, the job would need to be sedentary (R. 57). A sedentary RFC would still permit such a person to perform the jobs of the sedentary information clerk (2,000), and surveillance system monitor (2,200) (R. 56-57). However, the VE also stated that absences more than 10 percent of the time – that is, two or more days per month – would be cause for termination from these positions (R. 57).

### D.

On July 17, 2009 the ALJ issued a written opinion denying Mr. Aukstuolis benefits because she found him not disabled under the Social Security Act ("the Act") (R. 9-16). The ALJ found that Mr. Aukstuolis met the insured status requirements of the Act (R. 11). At Step 1, the ALJ found that claimant had not engaged in substantial gainful activity since August 24, 2006 (*Id.*).

At Step 2, the ALJ determined that Mr. Aukstuolis's cervical spine and shoulder injuries were severe, but his knee injuries were not severe (R. 11-12). The ALJ found that the claimant's weakness in his right arm and pain in his neck "caused more than minimal limitations in his ability to perform work activities" and thus were "severe impairments" (R. 11). The ALJ reasoned Mr.

8

Aukstuolis's knee injury could not be severe because he testified he did not need an assistive device, went grocery shopping, and walked to the fish pond without difficulty. The ALJ also found that the lack of objective medical evidence in the last several years persuasive on this point (R. 12). Despite Mr. Aukstuolis's testimony that he continued to have difficulty with his knee, the ALJ found Mr. Aukstuolis's knee injury imposed no more than minimal limitations on his ability to perform work related activities (*Id.*).

At Step 3, the ALJ found that Mr. Aukstuolis did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (R. 12). The ALJ then found that Mr. Aukstuolis had the residual functional capacity ("RFC") to perform light work as defined in CFR § 404.1567(b) with some exceptions, including that he cannot lift more than 20 pounds occasionally or 10 pounds frequently, stand and/or walk more than 6 hours in an 8 hour work day, sit for more than 6 hours in an 8 hour workday, limited pushing and/or pulling in his upper right extremities (*Id.*). The ALJ also determined that Mr. Aukstuolis should never climb ladders; should only occasionally climb stairs, stoop, kneel, crouch, or crawl; should not fully extend his upper extremity in reaching; and, should not perform more than occasional rotation and extension of his neck (*Id.*).

In determining this RFC, the ALJ followed a two-step process to determine whether the underlying medically determinable physical or mental impairments could reasonably be expected to produce the claimant's pain and other symptoms (R. 13). The ALJ found that Mr. Aukstuolis's headaches and neck pain caused by the herniated disc in his cervical spine, as well as the difficulty he experienced in feeling or using his right arm and hand, were medically determinable impairments that could reasonably cause the alleged symptoms (*Id.*). However, the ALJ did not find

9

Mr. Aukstuolis's statements about the intensity, persistence, and limiting effects of these symptoms "entirely persuasive to the extent they were inconsistent" with the RFC (*Id.*).

With respect to Mr. Aukstuolis's right arm and hand, the ALJ specifically pointed to progress notes indicating only occasional numbness and tingling in his fingers in addition to his doctors' observations that Mr. Aukstuolis had only mild decreased grip strength, no atrophy, and only some decreased sensation in his right arm and hand (R. 13). While the ALJ found it credible that Mr. Aukstuolis experienced difficulty feeling temperature in his right hand, the ALJ found the fact that he went fishing hurt his credibility (R. 14). Furthermore, the ALJ found that the fact that the MRI of Mr. Aukstuolis's forearm showed only mild degenerative arthritis in the elbow, and the MRI of the brachial plexus was normal, adversely affected the credibility of his claimed pain and limitations (R. 13).

In regard to the pain caused by the herniated disc, the ALJ noted that Dr. Komanduri and Dr. Saadi "were not convinced" that the herniation explained all of his symptoms (R. 13). The cervical spine fusion eliminated claimant's radicular pain, and the MRI and EMG testing, both of which came out normal, did not support his continued complaints of numbness and tingling. Additionally, the ALJ noted that the EMG and the nerve conduction study failed to reveal evidence of carpal tunnel syndrome, ulnar neuropathy, or cervical radiculopathy, or brachial plexopahty (*Id.*). The ALJ also noted that Dr. Urbanowski had suggested nerve root injections and sympathetic block and lidocaine injections, but due to his loss of insurance, Mr. Aukstuolis never followed through with these treatments (R. 14).

The ALJ also found Mr. Aukstuolis's testimony concerning his headaches not credible. The fact that Mr. Aukstuolis only takes Excedrin for his headaches, in addition to his admission that he worked through his headaches in the past, led the ALJ to disbelieve the credibility of his testimony that he needs to lay down for several hours every couple of days because of the pain (R. 14).

The ALJ did not give Dr. Komanduri's two opinion letters "significant weight" because the letters were conflicting (R. 14, 318). The first letter, dated April 14, 2007, indicated Mr. Aukstuolis was able to return to work (R. 14). The ALJ suggested this first letter might have been written to help the claimant get medical coverage (R. 14). The second letter, dated May 14, 2007, stated that he had "substantial cervical disc herniation with significant radiculopathy, " "extremely poor function . . . no use of his dominant hand and disabled from his job on the basis of pain, weakness, radiculopathy and loss of motor and sensory function" (R. 14) (internal quotations removed). The ALJ found the second letter not only conflicted with the first letter, but that it also was at odds with the medical evidence in the file (*Id.*). The ALJ gave diminished weight to the state agency physicians' assessment because the state agency physicians were not able to include the medical evidence submitted after their assessments (*Id.*).

At Step 4, the ALJ found that Mr. Aukstuolis cannot perform past work (R 15). The ALJ relied on the VE's testimony that Mr. Aukstuolis's past work was at the medium to heavy exertional levels, which someone with Mr. Aukstuolis's impairments cannot do (*Id.*).

At Step 5, the ALJ found that there are a significant number of jobs Mr. Aukstuolis could perform in the national economy (R. 15). The ALJ relied on the VE's testimony that, given Mr.

11

Aukstuolis's age, education, past work experience, and limitations, Mr. Aukstuolis could perform the jobs of information clerk (4,000 jobs), general parking lot attendant (not requiring parking cars) (2,000 jobs), and sales attendant with (29,500 jobs) (R. 16). Thus, the ALJ found Mr. Aukstuolis not disabled as defined by the Social Security Act.

## III.

The standards for review of an appeal from the Social Security Administration denying disability benefits are well established. To establish a "disability" under the Social Security Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant must demonstrate that her impairments prevent her from performing not only past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).

The regulations under the Social Security Act set forth a five-step process to determine whether a person is disabled. 20 C.F.R. § 404.1520(a)(4). Under these regulations, an administrative law judge ("ALJ") must consider: (1) whether the claimant presently has substantial, gainful employment; (2) whether the claimant's alleged impairment or combination of alleged impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) the specific impairments that are listed in the appendix to the regulations as severe enough to preclude gainful employment; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work that exists in significant numbers in the national

economy. *See* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1520(b)-(f); *see also Young v. Sec'y of Health and Human Serv.*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. *See* 20 C.F.R. § 404.1520(a)(4). A negative answer at any step other than Step 3 precludes a finding that the claimant is disabled. *Young,* 957 F.2d at 388. The claimant bears the burden of proof at Steps 1-4. In cases of severe impairment, the ALJ's analysis typically involves an evaluation of the claimant's residual functional capacity ("RFC") to perform past relevant work. *See* 20 C.F.R. § 404.1520(e). This RFC is used for purposes of Step 4 to determine whether the claimant may work in her previous occupations. *Id.*

At Step 5, the burden shifts to the Commissioner, who must "provid[e] evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [her] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). If a claimant's RFC allows him to perform jobs that exist in significant numbers in the national economy, then the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1).

In reviewing the ALJ's decision and use of the five-step process, courts may not decide facts anew, reweigh evidence or substitute their judgment for the articulated judgment of the ALJ. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The reviewing court will uphold the Commissioner's decision if it is supported by "substantial evidence," and is free of legal error. 42 U.S.C. § 405(g) (2004); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dray v. R.R. Retirement Bd.,* 10 F.3d 1306, 1310 (7th Cir. 1993) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If conflicting evidence would allow reasonable minds to differ, the responsibility

13

to determine disability belongs to the Commissioner (and ALJ, by extension), not the courts. *See Heir v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan,* 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible).

That said, an ALJ is not entitled to unlimited judicial deference. An ALJ must "build an accurate and logical bridge from the evidence to [his or] her conclusion," *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001), and "must confront the evidence that does not support his [or her] conclusion and explain why it was rejected." *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004). The ALJ must consider all relevant evidence, and may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision. *See Herron,* 19 F.3d at 334. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ must state the reasons he or she accepted or rejected "entire lines of evidence." *Id.* at 333; *see also Young,* 957 F.2d at 393 (in order for there to be a meaningful appellate review, the ALJ must articulate a reason for rejecting evidence "within reasonable limits"). The written decision must include specific reasons that explain the ALJ's decision, so that the reviewing court can ultimately assess whether the determination was supported by substantial evidence or was "patently wrong." *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000)).

## IV.

Mr. Aukstuolis attacks the ALJ's opinion on many fronts. *First,* he claims the ALJ erred by finding his knee impairment not severe (Pl.'s Mem. at 6-7), and *second,* by improperly disregarding his doctor's opinions (*Id.* at 11). *Third,* Mr. Aukstuolis claims the ALJ erred by omitting his sitting

limitations in the RFC (*Id.* at 10). *Fourth*, Mr. Aukstuolis argues that the ALJ erred by finding his statements of the extent of his pain and limitations not credible (*Id.* at 7-11). We consider these challenges in turn.

### A.

Mr. Aukstuolis objects to the ALJ's finding that his knee impairment is not severe (Pl.'s Mem. at 6-7). Mr. Aukstuolis claims the ALJ should have ordered additional x-rays if she found insufficient medical evidence (*Id.* at 6). Additionally, Mr. Aukstuolis says the evidence cited by the ALJ does not support the determination that his knee condition is not a severe impairment (*Id.*). Mr. Aukstuolis is correct that, at the second step of the five step sequential analysis the ALJ must determine whether the claimant's impairment or combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe if it "significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); *cf.* 404.1521(a).

That said, Step 2 is "merely a threshold requirement," and the ALJ need only find one severe impairment to proceed through the rest of the evaluation process. *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999); 20 C.F.R. § 404.1523. Once the ALJ has found a severe impairment, the ALJ must "consider the *aggregate* effect of the entire constellation of ailments-including those impairments that in isolation are not severe." *Golembiewski v. Barnhart,* 322 F.3d 912, 918 (7th Cir. 2003) (emphasis in original). Thus, the ALJ's determination that claimant's knee problem is not severe "is of no consequence with respect to the outcome of the case." *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010).

Moreover, the ALJ's determination that Mr. Aukstuolis's knee impairment is not severe is supported by substantial evidence. Mr. Aukstuolis bore the burden of proof at Steps 1-4. *See Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008). Therefore, Mr. Aukstuolis needed to prove that his knee injury was severe. The only evidence of any knee issues came from his testimony (R. 34-37), which was unsupported by medical evidence (R. 337, 362). Mr. Aukstuolis (who was represented by counsel at the hearing) could have requested further medical examinations or tests if he believed they would show that his knee injury was severe. He made no such request. The ALJ also discussed Mr. Aukstuolis's daily activities, which include walking 300 feet to the fish pond (about the length of a football field) and going grocery shopping. Furthermore, Mr. Aukstuolis testified he did not need a cane nor has he ever fallen down (R. 37), which is consistent with his doctor's observations that he has a normal gait.

On this record, Mr. Aukstuolis's reliance on *Scott v. Astrue* is misplaced. 647 F.3d 734 (7th Cir. 2011). There, the appeals court found error in ALJ's assumption that because claimant could walk 50 feet without assistance, he did not actually need to use his prescribed cane. By contrast, here the evidence shows that no doctor ever has prescribed use of a cane for Mr. Aukstuolis. Mr. Aukstuolis's doctors' objective medical findings after 2006 all report he has a normal gait (R. 337, 362).

Finally, the ALJ's RFC includes knee limitations that address Mr. Aukstuolis's knee condition. The RFC states Mr. Aukstuolis should never climb ladders and only occasionally climb stairs, stoop, kneel, crouch, or crawl (R. 12). Therefore, the ALJ accounted for Mr. Aukstuolis's knee impairment. On this record, we find no error in the ALJ's finding that Mr. Aukstuolis's knee impairment did not require greater limitations on his ability to perform work-related activities.

**B.**

Mr. Aukstuolis also claims that the ALJ improperly disregarded his doctors' opinions (Pl.'s Mem. at 11). In determining the weight to give the opinion of a treating physician, the ALJ must consider "the consistency and support for the physician's opinion." *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010). The ALJ gave sufficient reasons for not giving significant weight to the medical opinions, explaining how Dr. Komanduri's notes conflict with each other and the record. Mr. Aukstuolis also points to a letter written by Dr. Saadi that the ALJ did not address. However, Dr. Saadi's letter predated the cervical spine surgery that eliminated the radicular pain in Mr. Aukstuolis's right upper arm (R. 337), and thus we find no error in the ALJ's failure to address it. *See Diaz,* 55 F.3d 300, 308 (7th Cir. 1995) ("an ALJ need not provide a complete written evaluation of every piece of testimony and evidence").

**C.**

Mr. Aukstuolis contends the ALJ incorrectly determined his RFC because she ignored testimony about his inability to sit for an extended period (Pl.'s Mem. at 10). While the RFC does not include any sitting limitations, the ALJ addressed some of these additional concerns when questioning the VE (R. 55). The ALJ asked what jobs would be available for a person of Mr. Aukstuolis's age, education, work experience, and skill set, who was limited to "light work, that only required occasional pushing and pulling on the right, down the hand, only occasional rotation and extension of the neck. No climbing of ladders, ropes or scaffolds, only occasional stairs, only occasional crouching, crawling, and kneeling. And no full extension of the right arm for reaching" (R. 54). That hypothetical substantially incorporated the RFC limitation the ALJ ultimately found

17

(R. 12). The VE said a person with these limitations could perform the work of an information clerk (4,000 jobs), sales attendant (29,000 jobs), and general parking lot attendant (2,000 jobs) (R. 55).

The ALJ then amended the hypothetical to include a limitation that the person would "sit, stand every half hour, [and] that doesn't take them off task more than ten percent of the day" (R. 55). The VE said that would limit the available work to sedentary jobs, which include unskilled information clerks (2,000 jobs), surveillance system monitor (2,200 jobs), and order clerks (2,900 jobs) (R. 56).

We recognize that at Step 5, the ALJ relied upon the availability of light work, and not on sedentary jobs available (R. 15-16). But the VE's testimony shows that even if Mr. Aukstuolis were limited to sedentary work, there are enough jobs available to support a finding that Mr. Aukstuolis is not disabled. *See Guranovich v. Astrue*, 465 F. App'x. 541 (7th Cir. 2012) (where ALJ's error at Step 4 was harmless because additional limitations were taken into account at Step 5); *see also Kittelson v. Astrue*, 362 F. App'x. 553 (7th Cir. 2010) (where the court determined that the ALJ's failure to specifically address claimant's obesity in his credibility assessment was harmless because his summary of medical complaints demonstrated he was aware of the issue). We will not remand for an error that would not affect the ultimate determination of disability. *See Suffi v. Astrue*, 10 C 2443, 2011 WL 1706139 (N.D. Ill. May 5, 2011) (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("There is no requirement that an ALJ's opinion be perfect as long as the result is sound").

## D.

Lastly, Mr. Aukstuolis argues that the ALJ improperly evaluated his credibility and, as a result, erred in determining his RFC (Pl's Mem. at 7-11). An ALJ may not "discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence."

*Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004) (quotation omitted); *see also* 20 C.F.R. § 404.1529(c)(2). A credibility examination must "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p. To determine credibility the ALJ must consider a range of factors such as the objective medical evidence, the claimant's daily activities, pain allegations, aggravating factors, types of treatment received, medication taken, and "functional limitations." *See* 20 C.F.R. § 404.1529(c)(2)-(4); *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006) (citation omitted). While an ALJ is not required to provide a "complete written evaluation of every piece of testimony and evidence," *Diaz,* 55 F.3d 300, 308 (7th Cir. 1995), an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible. *Rice v. Barnhart,* 384 F.3d 363, 370 (7th Cir. 2004).

Mr. Aukstuolis says the ALJ did not correctly address the credibility of complaint that he suffers headaches that require him to lay down every third day for four hours (Pl.'s Mem. at 10). However, the ALJ discussed several reasons why she found his allegations not credible: she pointed to his use of only Excedrin for pain, the fact that he worked through his headaches in the past, and the lack of objective medical evidence (R. 14). Given the deference we owe to credibility determinations made by an ALJ who saw and was able to assess the witness, *Shramek v. Apfel,* 226 F.3d 808, 811 (7th Cir. 2000); *Sayles v. Barnhart,* 00 C 7200, 2001 WL 1568850 (N.D. Ill. Dec. 7, 2001), we do not consider this determination to be patently erroneous.

Mr. Aukstuolis also argues the ALJ did not correctly address the credibility of his right shoulder, arm, and hand pain. Here, Mr. Aukstuolis's argument has some force. While the ALJ did not need to address every statement or piece of evidence in the case, some discussion of Mr. Aukstuolis's daily activities was required. *See Prochaska,* 454 F.3d at 738; *see also Rice,* 384 F.3d

at 370. Lack of supporting objective medical evidence alone was not enough to determine that Mr. Aukstuolis is not credible. *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The ALJ only cited Mr. Aukstuolis's ability to go fishing, and her treatment of that activity was minimal, and poorly explained (R. 14). The ALJ did not describe how fishing shows he can use his hand. The ALJ also did not address the other daily activities such as bathing and holding a cup of coffee, for which Mr. Aukstuolis claims he cannot use his right hand. The ALJ should have discussed the discrepancies in the evidence directly.

However, the ALJ's mistake is ultimately harmless because Mr. Aukstuolis's impairments were taken into account by the VE's testimony. The VE's narrowed the available sedentary jobs to information clerk (2,000 jobs) and surveillance system monitor (2,200 jobs) if Mr. Aukstuolis could only occasionally use his right hand for fingering or handling. There is substantial evidence to support that Mr. Aukstuolis retains at least some use of his right hand. Mr. Aukstuolis's objective medical examinations revealed no obvious weakness or atrophy, and an unremarkable sensory examination (R. 337).

We again confront a situation where the ALJ's analysis may be lacking, but that shortcoming does not drop to the bottom line of the disability assessment. Even when accounting for Mr. Aukstuolis's claims of limited use of his right hand, the VE's testimony – which is unchallenged – shows that there are a substantial number of jobs that Mr. Aukstuolis could perform. We will not remand in the quest for a more perfect ALJ opinion, where the record shows that a remand would not affect the ultimate outcome. *See Suffi*, 2011 WL 1706139; *see also Diaz*, 55 F.3d 300, 307–08.

## CONCLUSION

This Court directs the Clerk of the Court to enter judgment granting the Commissioner's motion for summary affirmance for denial of benefits (doc. # 21), and denies Mr. Aukstuolis's motion for summary remand (doc. # 19). The case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: August 3, 2012**